UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK



RECEIVED

NOV 25 2024

PRO SE OFFICE

KAHREEM PERRY,

Plaintiff,

- against -

STEVEN VEGA, et al,

Defendants.

THIRD AMENDED

COMPLAINT

22- CIV - 5813

(JHR)(SN)

## PARTIES

1.   Defendant Christian Molina ("Molina") is a police officer stationed at the PSA 4 Precinct, New York County.  He is being sued in his individual capacity.

2.   Defendants David Robles ("Robles") and Yvette Agosto ("Agosto") reside at 388 Pearl Street, Apartment 4G, New York County.

## STATEMENT OF FACTS

1.   On October 23, 2021, Plaintiff Kahreem Perry ("Perry") and Defendant Robles had a fight in the hallway outside of Robles apartment at 388 Pearl Street, New York County.  After the fight Perry ran up to his aunt's apartment on the 15th floor.

2.   Robles coerced his mother, Defendant Agosto, to call the police and report that she had been robbed at gunpoint.

3.   Defendants Steven Vega ("Vega"), Molina, Sajit Tomy ("Tomy"), Myles Leonard ("Leonard"), Thomas McCue ("McCue"), Police Sergeant Kirk Bermelin ("Sgt Bermelin") responded to Agosto's 911 call.

4.   Robles and Agosto informed Vega that a man wearing all black with a gun

- 1 -

pushed Agosto into her apartment, demanding money, as she returned from emptying the trash at 3:27 a.m.. Robles gave a general description of the perpetrator as a skinny black male, around 5' 5" in his 40's.

5. Leonard's body worn camera (BWC) shows Leonard asking Agosto and Robles were they able to describe the gunman's "skin complexion" or "facial hair" features.

6. Agosto did not respond at all. Robles responded that, because the incident "happened so fast" he was unable to identify the alleged robber's natural physical features. See, Leonard's BWC.

7. Leonard and Tony canvassed the building and came upon Perry on the 15th floor. Leonard told Perry he fit the description of a man who just committed a crime and was being detained until he was either identified or not identified as the person who robbed Agosto and Robles.

8. Agosto is a sickly, elderly woman with mobility problems. Because of this and her appearing to be unfit, Vega told Robles to participate in a show-up identification procedure. Robles refused because he did not want to leave his kids alone in the apartment. See, Vega's BWC. Agosto left with Vega for the show-up.

9. On the elevator ride up to the 15th floor, Sgt Bermelin asked Agosto; "Did you get a good look at [the perpetrator's] face?" Agosto indicated that she did not, again placing this failure to see the gunman's face because the incident "was so fast." See, Vega's BWC #6.

10. Once on the 15th floor, Vega took a cell phone picture of Perry and showed the photograph to Agosto, asking; "Is that him?" Agosto stared at the photo for 5 seconds before stating; "It looks like him, but he changed his clothes." See, Vega's BWC #6. Vega, with Agosto, went back to Agosto's apartment to show Robles the single cell phone photo.

11. At 4:02:54 a.m., Vega showed Robles the single photo asking; "Is that him?" Robles replied; "I'm not sure." Vega held the phone up to Robles' face saying; "I need you to look at his face, is this him?" Again Robles stated; "I'm not sure." Vega then tells Robles; "Okay, you want t o go upstairs to take a look

at him?"

12. Robles refused to go with Vega, saying; "I'm not getting involved with no court stuff. I'm not being a snitch or whatever." See, Vega's BWC #6.

13. Vega then shows Robles the single cell phone photo a third time demanding; "Is this him, yes or no?" Robles repeated; "I'm not sure." See, Vega's BWC #6.

14. Vega thereafter turned to Agosto, showing the single cell phone photo a second time, asking; "So ma'am, is this him?" Agosto repeated; "It kinda' looks like him." Vega reported to Sgt Bermelin, who was on the 15th floor with Perry, that Agosto; "can't say it's him because she did not get a good look at his face... and the son doesn't want to get involved even though he already told me he gave the guy twenty dollars." See, Vega's BWC #6.

15. Vega went back to Agosto at 4:14:33 to show her the single cell phone photo, saying; "So ma'am, just one more look one more time; is that him?" Again, for the fourth time, Agosto could only say; "It looks like him." Vega showed Agosto the single photo a fourth time, still asking; "Is this him, yes or no?" At the fourth showing Agosto stated; "Yes, it's him." See, Vega's BWC #6.

16. While Vega conducted this constitutionally infirm suggestive show-up identification procedure, Defendants Leonard, McCue, Tomy and Sgt Bermelin had Perry detained on the 15th floor.

17. When Agosto failed to identify Perry at the initial showing of the single photo, Perry stated to Leonard; "The lady didn't pick me out, she said I didn't do it; why am I still here?" Leonard replied; "She didn't say you did it, she didn't say you didn't do it... We're just trying to figure something out." See, Leonard's BWC.

18. When Agosto finally stated it was Perry who robbed her, Vega reported this to Sgt Bermelin, who made a hand gesture to Leonard to arrest Perry.

19. Perry was taken to the police station where he informed Vega that Robles has a surveillance camera on his apartment door and asked Vega to get it because

the video from that camera would prove what Robles and Agosto had said "never happened." At his request, Perry was taken to speak with an assistant district attorney (ADA). See, Vega's BWC.

20. Perry was brought before ADA Bradley Barbour, who conducted a Video Interrogation ("VI"). Perry informed ADA Barbour that: (1) he fought with Robles in the hallway, outside of Robles apartment; (2) Agosto was never in the hallway while the fight took place; (3) He had dropped his phone on the floor of the hallway outside of Robles' apartment, and (4) that Robles has a surveillance camera attached to his apartment door. Perry informed ADA Barbour that the camera records and asked ADA Barbour to get the video because it would prove his innocence. ADA Barbour stated that he was told that the camera didn't work, but that he would get a search warrant for the video if he did not get it voluntarily. See, VI. ADA Barbour did not get it voluntarily nor did he get a search warrant for it.

21. After the VI, Vega filed a facially insufficient Felony Complaint ("FC") charging Perry with, inter alia, Robbery and burglary in the first degree.[1] In the FC, Vega reported that Agosto (identified in the FC as "INFORMANT 1") and Robles (identified in the FC as "INFORMANT 2") stated to him that Perry robbed them in their home at gunpoint. The FC states that Perry took $20 off a table in the apartment and that Robles was "uncooperative." The FC further staes that Agosto gave a description of Perry and that Perry stated to Vega that he fought with Robles outside of Robles' home.

22. The facially insufficient FC contains false information and material omissions. The FC falsely states that Agosto described Perry as a male black, 5' 5", in his 40's. This is false because Agosto's only description of Perry was

_____

1 - Perry was also indicted for possession of a controlled substance.

- 4 -

"he's about my height." Vega reporting that Agosto stated Perry took $20 from a table is also false because Vega's BWC #6 shows Robles telling Vega that he gave the suspect "the $20" and Vega's memo book states Robles "gave suspect $20."

23. The material omissions made by Vega were: (1) Agosto's equivocal identification of Perry as the man who robbed her, and (2) Robles failure and refusal to identify Perry as the perpetrator. Vega also falsely reported that Robles stated that Perry entered his apartment with a gun committing robbery.

24. On October 26, 2021, ADA Barbour presented the case to the Grand Jury.[2] Agosto was first called to testify. Agosto falsely testified that when Vega showed her the single photo of Perry on the 15th floor she immediately identified Perry as the man who robbed her, stating; "It was him." Vega's BWC #6 shows Agosto's testimony is false and known to be false to ADA Barbour.

25. Agosto falsely testified that Perry took $20 from a table in her living room. Vega's BWC #6 shows that testimony to be false and known to be false by ADA Barbour.

26. Agosto was not asked by ADA Barbour, did she make an equivocal identification or how many times did she make an equivocal identification of Perry as her assailant before telling Vega "it was him."

27. Vega was also called before the Grand Jury. He testified that he showed Agosto the single cell phone photo but nothing further. What Vega did not tell the Grand Jury was that he had shown Agosto the single photo three times and that she could only say; "It kinda' looks like him," and that only when he showed the single photo to her the fourth time, did she finally say; "it was him."

_____

2 - Robles refused to appear before the Grand Jury.

28. Vega did not tell the Grand Jury -- nor did ADA Barbour elicit testimony -- that he showed Robles the single photo three times and Robles did not identify Perry as the robber, nor did Vega inform the Grand Jury that Robles refused to participate in the show-up identification procedure.

29. Vega did not inform the Grand Jury that neither Agosto or Robles were able to identify Perry's natural physical features (i.e.; skin complexion, facial hair) because Agosto did not "get a good look at his face" because the incident "happened so fast."

30. Vega falsely testified that Perry stated to him (not ADA Barbour) that "there was no old woman in the apartment he robbed" and that Perry stated "he did not realize that he left his phone in the apartment." This testimony is contradicted by the FC signed by Vega that states Vega was informed by Perry that he fought with Robles outside Robles apartment, and by Vega's sworn search warrant affidavit that states Perry stated he "he dropped his cell phone in the hallway, not in [Robles'] apartment."

31. Vega's false testimony, known to be false by ADA Barbour, influenced the Grand Jury decision to indict.[3] This can be seen by the questions asked by two Grand Jurors. One asked whether Perry's statements to Vega was "hearsay," to which ADA Barbour replied that Perry's statements were "admissions." Another Grand Juror asked; what did Perry say about the "old lady in the apartment?" Vega testified in response that Perry "stated there was no old woman in the apartment during his confrontation with [Robles]."

---

3 - Agosto's false positive identification also influenced the Grand Jury decision.

32. Vega's false testimony involving Perry's "admissions"[4] established the elements of robbery and burglary in the first degree.

33. Although ADA Barbour informed the Grand Jury that Perry's statements to Vega were "admissions" and that he would instruct them on what an admission is, ADA Barbour never gave such an instruction.

34. Perry was indicted for robbery and burglary in the first degree. The Grand Jury's decision to indict was on the basis of: (1) Agosto's unequivocal identification of Perry as the man who robbed her, and (2) Perry's alleged "admissions" to Vega.

35. Upon receiving the discovery material in his criminal case, Perry learned of Vega's material omissions and false reportings. In his memo book, Vega reported that "Robles stated he gave suspect $20." This report is false because Robles never identified Perry as the person he gave $20 to. The material omission goes hand-in-glove with this false reporting because Vega did not report that Robles' failure to identify Perry nor his refusal to cooperate with the show-up procedure.

36. Vega's intentional deception to depart from normal police practice and not document Agosto's equivocal identification as well as Robles' failure and refusal to identify Perry and further, to conceal that evidence from the Grand Jury, demonstrate Vega's malicious intent to deprive Perry of liberty, and with the purpose of securing an indictment.

37. Perry was adamant about his innocence and continuously asked Vega and ADA Barbour to get the video from Robles' surveillance camera. After the indictment, Vega visited Agosto's home inquiring about the operation and model of the

---

4 - The alleged statements were more of a confession than an "admission."

- 7 -

surveillance camera. Agosto is seen on Vega's BWC[5] frustrated that Vega is there about the camera. She tells Vega that the camera worked (ADA Barbour said he was told it did not ) but that it doesn't record and that she did not know the model. Vega took pictures of the entire surveillance device and explained this procedure was only for Perry's lawyer if it was asked about.

38.    ADA Barbour and Vega, by expending reasonable effort as Vega did, could have conclusively established Perry's innocence had they retrieved the surveillance video.

39.    There are several reasons why Vega and ADA Barbour should have, but did not, get the video:  (1) Once Agosto confirmed that the surveillance camera worked, this should have alerted Vega and ADA Barbour that something was wrong and that Agosto and Robles were hiding something, since they initially told Vega, who reported to ADA Barbour, that the device did not work (2) the fact that Perry continuously asked Vega and ADA Barbour to get the video should have prompted them to get it because nowhere in the world will a guilty person direct the police and prosecutor to a video depicting a crime being committed by him (3) Agosto's unawareness of the model of the device should have also made Vega and ADA Barbour suspicious, prompting them to get the video, and (4) Vega and ADA Barbour did not obtain the video because they knew the video would show (as Perry had told them) the robbery "never happened."

40.    Just before the trial began, Agosto and Robles removed the surveillance camera.

THE TRIAL

41.    The trial commenced on December 6, 2023, and Agosta was called as the

_____

5  -  The BWC number of this visit is not known, Vega's BWC's are numbered 1 - 6.

People's star witness.  Despite her Grand Jury testimony that Perry had taken $20 from her living room table, she testified at trial that she did not know how much money Perry took from her apartment.  [AGOSTO: 56][6]

42.  Agosto did not inform the jury -- nor did ADA Barbour elicit testimony -- that she was unable to identify Perry's natural physical features because she did not "get a good look at his face," and that she did not get a good look at his face because the incident "happened so fast."  Thus, when asked, did she see the person who robbed her in the courtroom, Agosto testified;  "No, I don't see him." [AGOSTO: 53-54].

43.  While the jury was out to lunch, Agosto was allowed to remain in the witness chair due to her being mobility-challenged.  While sitting there she observed observed court officers towering behind Perry and whispered to the judge, she thinks Perry looks like the guy who robbed her.  When the jury returned, Agosto made an in-court identification.  She testified that her initial failure to make an in-court identification was due to a current eye problem.  [AGOSTO:  65].

44.  Agosto thereafter testified that she did not have that eye problem on the day of the robbery and that she did not have a problem identifying Perry as the person who robbed her because he was within a few feet away from her and that the incident took place between 6 to 8 minutes.  [AGOSTO:  65-67, 112].  This testimony is completely contradicted by Agosto's prior statements to Vega as seen on Vega's BWC #6.

45.  Agosto falsely testified on cross-examination that Vega only showed her the single cell phone photo twice and each time she identified Perry as the man who robbed her.  [AGOSTO: 114].

46.  Concerning the surveillance camera, described by ADA Barbour as "the black thing on your door," Agosto falsely testified that it wasn't working at the

6  -  Names preceded by numbers indicate the page number of trial testimony.

time of the incident. [AGOSTO: 70]. Agosto explained that when the "camera" worked it was activated only if someone rang the doorbell and the camera would 'take a picture," to show her who was at the door. [AGOSTO: 70].

47. Without notice, ADA Barbour called Robles to provide testimony against Perry. Vega's BWC #6 shows Robles telling Vega he gave the robber $20, but at trial, Robles said Perry took "seventeen, eighteen, nineteen dollars" from a table near his tv. [ROBLES: 170, 175].[7]

48. Robles testified that the surveillance camera, "the dark circular object on the door," when the button was pushed "it would just show you who was there," and it did not record. [ROBLES: 185-186].

49. On cross-examination, Robles claimed not to remember much of anything, not even his mother's age. [ROBLES: 178, 201]. Regarding the surveillance camera, Robles testified that he did not install it. He "believe the housing guy" installed it to intimidate people to think they were being recorded, but he did not know when the housing guy installed it. [ROBLES: 201, 202].

50. Robles falsely testified that the surveillance camera, the "contraption," did not work on the day of this incident. He explained that "it was not powered it was broken," that the power was designed to power the ringer... so you can hear the ringer when somebody rang the doorbell." [ROBLES: 202-203].

51. Vega's BWC #6 dated October 23, 2021, "the day of the incident," was shown to the jury. The surveillance camera, the "contraption," "the dark, circular object on the door," was seen working, "power[ing] the ringer."

52. Robles testified that he recognized the person in the photo showed to him

---

7 -- This change of the amount of money taken was because Robles had learned that Perry had money only in small bills.

by Vega in an attempt to identify Perry in court, but because the Court ruled in a pre-trial proceeding that Robles was not being called to trial, the trial did not allow Robles to make an in-court identification. [ROBLES: 187-195].

53. Vega was also called to testify. Vega admitted that he showed Agosto the single photo "about three times." [VEGA: 400].

54. Perry testified on his own behalf. Perry informed the jury that: (1) he had fought with Robles; (2) that Agosto was never in the hallway when he fought with Robles; (3) that Robles coerced Agosto to say that he robbed her; (4) that Agosto never identified him at the scene, and (5) that he had told Vega and ADA Barbour about the surveillance camera "the very second" he got arrested, stating that, if he robbed Agosto, he would never have alerted the police and prosecutor about the surveillance camera. [PERRY 408-411].

55. Perry also directed the jury's attention to Robles' and Agosto's lies about the surveillance camera. Perry testified; "You [the jury] just seen on the screen they [police] press the buzer, ding dong, it works." [PERRY: 415-416].

56. The jury deliberated for 3½ hours and returned with a not guilty verdict for the robbery and burglary charges.

- 11 -

FIRST CAUSE OF ACTION

59.    Defendants Vega, Sgt. Birmelin, Leonared, Tomy, McCue and Molina, illegally detained, unreasonably seized and falsely arrested and imprisoned plaintiff without probable cause in violation of the Forth Amendment as described in paragraphs 16 - 19 of this complaint. Alexander v. City of New York, 2019 WL 5887300 (S.D.N.Y. Nov. 8, 2019).

60.    Defendant Agosto's equivocal identification did not provide probable cause for the continued detention that ripened into a de facto arrest. Williams v. City of New York, 2012 WL 511533.

61.    Once Agosto and Robles failed and refused to identify plaintiff as their assailant, and the investigation into the cell phone did not link to plaintiff, plaintiff should have been free to leave. United States v. Babwah, 972 F2d 30 (2d Cir. 1992).

SECOND CAUSE OF ACTION

62.    Defendant Vega violated plaintiff's Fourteenth Amendment due process rights when he employed a constitutionally infirm suggestive identification procedure that coerced in an unequivocal identification as described in paragraphs 11, 12, 13, 14 and 15. Mason v. Braithwaite,
Dufort v. City of New York, 874 F3d 338 (2d Cir. 2017).

THIRD CAUSE OF ACTION

63.    Defendant Molina failed to intervene while Vega conducted the constitutionally infirm suggestive identification procedure as described in paragraphs 11-15 of this complaint.

- 12 -

Rosario v. City of New York, 2021 WL 199342 (S.D.N.Y. Jan. 20, 2021).

# FORTH CAUSE OF ACTION

64.     Plaintiff's constitutional right to a fair trial under the due process clause was violated by defendant Vega as described in paragraphs, 21, 22, 23, 27, 28, 29, 30, 31, 32, 35, 36, 37, 39 of this complaint. Kee v. City of New York, 12 F. 4th 150 (2d Cir. 2021); Hutchins v. Solomon, 2018 WL 4757970 (S.D.N.Y. Sept. 19, 2018).

# FIFTH CAUSE OF ACTION

65.     Plaintiff's prolonged detention (October 23, 2021 to December 14, 2023) - caused by defendant Vega's failure to institute proper identification procedures in violation of the plaintiff's due process rights, Vega's omissions and false testimony before the grand jury, and Vega's failure "to investigate specific, readily - verified claims of innocence in a reasonable time period", which "clearly covers reviewing a surveillance camera video record of a crime when ... it was easily available piece of evidence - violated plaintiff's Forth Amendment right. Russo v. City of Bridgeport, 479 F3d 196 (2d Cir. 2007).

# SIXTH CAUSE OF ACTION

66.     Defendant Vega is liable for malicious prosecution due to his actions described in paragraphs 21, 22, 23, 27, 28, 29, 30, 31, 35, 36, 37 of this complaint. Manganiello v. City of New York, 612 F.3d 149 (2d Cir. 2010).

# SEVENTH CAUSE OF ACTION

- 13 -

67.        Defendant Agosto is liable for false arrest due to her actions described in paragraph 16 of this complaint. Levitz v. McQuade, 801 Fed Appx 808.

EIGHTH CAUSE OF ACTION

68.        Defendant Agosto and Robles are liable for malicious prosecution due to their actions as described in paragraphs 24, 25, 34, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 52, of this complaint. Stampf v. Long Island R. Co., 761 F.3d 192, 199-200 (2d Cir. 2014).

RELIEF SOUGHT

WHEREFORE, plaintiff requests that this Honorable Court grant the following relief:

A. Compensatory damages in the following amounts:

1. $200,000 jointly and severally against defendant's Vega, Sgt. Birmelin, Tomy, Leonard and McCue for the mental anguish, emotional distress and lost wages as a result of the loss of liberty caused by the defendant's actions described in paragraphs 16, 17, 18, and 52 of this complaint.

2. $50,000 against defendant Molina for the mental anguish and emotional distress for his actions described in the third cause of action.

3. $500,000 jointly and severally against Vega, Agosto and Robles for the mental anguish, emotional distress and seperation from family and lost wages as a result of the loss of liberty caused by the actions of the defendant's described in this complaint.

B. Punitive damages in the following amounts:

- 14 -

1. $150,000 each against Tomy, Leonard, McCue and Sgt. Birmelin.

2. $50,000 against Molina.

3. 750,000 each against Vega, Agosto and Robles.

Grant such other relief this Honorable Court deem just and fair.

DATED:    October 18, 2024

Kahreem Perry
Elmira Corr. Fac.
1879 Davis Street
Elmira, N.Y. 14902

ELMIRA CORRECTIONAL FACILITY

ELMIRA, NEW YORK 14902-0500

USM SDNY 4P

ELMIRA
Correctional Facility
ZIP 14901
$002.31

RECEIVED
NOV 25
PRO SE OFFICE

Pro Se Office
U.S. Dist. Court
40 Foley Square
500 Pearl Street
New York, NY 10007

ATTN: Hon. Sarah Netburn
U.S. Magistrate Judge

Legal Mail